WMP:WMN/SCJ/PH/CK
F. #2013R01203

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ NOV 0 2 2015 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ABRAXAS J. DISCALA,
       also known as "AJ Discala,"
IRA SHAPIRO,
CRAIG JOSEPHBERG,
       also known as "Jobo,"
KYLEEN CANE,
DARREN GOODRICH,
DARREN OFSINK and
MICHAEL MORRIS,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. <u>14-399 (S-1) (ENV)</u>
(T. 15, U.S.C., §§ 78j(b) and 78ff;
T. 18, U.S.C., §§ 371, 981(a)(1)(C),
1343, 1349, 2 and 3551 <u>et seq.</u>;
T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

## INTRODUCTION

      At all times relevant to this Indictment, unless otherwise indicated:

I.    <u>The Defendants and Relevant Entities</u>

      1.    The defendant ABRAXAS J. DISCALA, also known as "AJ Discala," a

resident of Rowayton, Connecticut, was the Chief Executive Officer of OmniView Capital

Advisors LLC ("OmniView"). DISCALA formed OmniView on or about February 3, 2011.

DISCALA also controlled The Broadsmoore Group LLC ("Broadsmoore") and Fidelis Holdings,

LLC ("Fidelis").

2.     OmniView was a Delaware limited liability company with its principal place of business in Rowayton, Connecticut, and an office in New York, New York. OmniView marketed itself as a merchant bank that sought to create partnerships with companies that were fundamentally sound in order to provide required capital and strategic advice. OmniView claimed to possess a team of seasoned professionals who had extensive knowledge of the capital markets, including having: (i) experience in raising capital through private placements, alternative public offerings and reverse takeovers of companies whose shares were traded on the Over-the-Counter ("OTC") exchanges; (ii) substantial contacts to bolster management boards; and (iii) a model that prevented any conflicts of interest between OmniView, investors and the target companies.

3.     The defendant IRA SHAPIRO, a resident of Congers, New York, was the Chief Executive Officer and Chairman of the Board of CodeSmart Holdings, Inc. ("CodeSmart") and First Independence Corp. ("First Independence").

4.     The defendant CRAIG JOSEPHBERG, also known as "Jobo," a resident of New York, New York, was registered as a broker. In or about and between November 2010 and October 2013, JOSEPHBERG was employed as a broker by Halcyon Cabot Partners, Ltd. ("Halcyon"), a broker-dealer registered with the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority, Inc. ("FINRA"), at its office in New York, New York. In or about and between October 2013 and June 2014, JOSEPHBERG was employed as a broker by BD Firm 1, a broker-dealer registered with the SEC and FINRA, the identity of which is known to the Grand Jury, at its office in New York, New York. JOSEPHBERG also controlled Garper LLC ("Garper"), a Delaware limited liability company with its principal place of business in New York, New York.

5.    The defendant KYLEEN CANE, an attorney and resident of Las Vegas, Nevada, was the managing partner of Cane Clark LLP, a law firm that purportedly specialized in providing corporate and securities legal services to public companies with small capitalization.

6.    The defendant DARREN GOODRICH, a resident of Manhattan Beach, California, was registered as a broker. GOODRICH was a Managing Director and the Head Trader at BD Firm 2, a broker-dealer registered with the SEC and FINRA, the identity of which is known to the Grand Jury, with its principal place of business in El Segundo, California.

7.    The defendant DARREN OFSINK, an attorney and resident of Merrick, New York, was the principal of Ofsink LLC, a law firm that purportedly serviced small and mid-size companies by functioning as an off-site general counsel and professional advisor.

8.    The defendant MICHAEL MORRIS, a resident of Merrick, New York, was registered as a broker. MORRIS was a Managing Director of Halcyon, a broker-dealer registered with the SEC and FINRA, with its principal place of business in New York, New York. MORRIS also served for a period of time as the Chief Compliance Officer of Halcyon.

II.    The Relevant Publicly Traded Companies

9.    CodeSmart, formerly First Independence, was a Florida corporation with its principal place of business in New York, New York. CodeSmart traded under the ticker symbol ITEN. CodeSmart's purported business plan consisted of furnishing the healthcare industry with educated, trained and qualified "ICD-10" certified coders. ICD-10, the tenth revision of the International Statistical Classification of Diseases and Related Health Problems, a medical classification list created by the World Health Organization, was the medical coding system mandated by the Centers for Medicare and Medicaid Services as part of the Patient Protection and Affordable Care Act of 2010. CodeSmart offered "CodeSmart University" as "an

3

online program of study for existing coders, new coders, clinicians and healthcare roles of all types."

10.     Cubed, Inc. ("Cubed"), formerly a mining exploration company known as Northwest Resources, Inc. ("Northwest"), was a Nevada corporation with its principal place of business in Las Vegas, Nevada. Cubed traded under the ticker symbol CRPT. Cubed's purported business plan involved the "Get CUBED" mobile-first platform, which Cubed claimed was "a cloud-based, three-dimensional functional cube that appears on the screens of mobile device owners, allowing developers and users to present complex and contextual concepts in a clear and simple manner."

11.     StarStream Entertainment Inc. ("StarStream"), formerly Gelia Group, Corp., was a Nevada corporation with its principal place of business in Monterey, California. StarStream traded under the ticker symbol SSET. StarStream's purported business plan consisted of producing, promoting, supporting and developing motion pictures and funding motion picture entities.

12.     The Staffing Group, Ltd. ("Staffing Group"), formerly Aviana, Corp., was a Nevada corporation with its principal place of business in New Orleans, Louisiana. Staffing Group traded under the ticker symbol TSGL. Staffing Group's purported business plan consisted of recruiting, hiring, employing and managing skilled workers for its clients.

III.    Relevant Regulatory Principles and Definitions

13.     The term "beneficial owner" was defined under the rules of the SEC. It included any person who directly or indirectly shared voting power or investment power (the power to sell a security). When a person or group of persons acquired beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of

the Securities Exchange Act of 1934, they were required to file a Schedule 13D with the SEC.

Schedule 13D reported the acquisition and other information within ten days after the purchase.

The schedule was filed with the SEC and was provided to the company that issued the securities

and each exchange on which the security was traded. Any material changes in the facts

contained in the schedule required a prompt amendment.

14.     The term "nominee" in the securities fraud context referred to a person or

firm into whose name securities or other properties were transferred in order to facilitate

transactions, while concealing the customer as the actual owner. A "nominee account" was a

type of account in which a stockbroker held shares belonging to clients in the name of a sham

entity or another individual. The use of nominees and nominee accounts was designed to

conceal the true ownership interest of the customer.

15.     "Microcap" or "penny" stocks referred to stocks of publicly traded U.S.

companies which have a low market capitalization. Microcap stocks were often subject to price

manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks

that traded on notable exchanges. Additionally, large blocks of microcap stock were often

controlled by a small group of individuals, which enabled those in the group to control or

orchestrate manipulative trading in those stocks.

16.     A "pump and dump" scheme was a scheme where a group of individuals

who control the free trading or allegedly unrestricted shares, also referred to as the "float," of a

microcap company fraudulently inflated the share price and trading volume of the targeted public

company through, inter alia, wash and matched trades, false and misleading press releases and

paid stock promotions. When the target company's share price reached desirable levels, the

individuals sold their free trading shares for substantial financial gain.

17.     Wash trades were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership. For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of Company A through Broker A while simultaneously selling 100 shares at $5.00 per share of Company A through Broker B. Matched trades were similar to wash trades but involved a related third person or party who placed one side of the trade. For example, a matched trade took place when Investor A bought 100 shares at $5.00 per share of Company A through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of Company A through a broker. Both wash trades and matched trades were used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

IV.     The Fraudulent Market Manipulation Schemes

18.     In or about and between October 2012 and July 2014, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS, together with others, agreed to defraud investors and potential investors in CodeSmart, Cubed, StarStream and Staffing Group (collectively, the "Manipulated Public Companies") by artificially controlling the price and volume of traded shares in the Manipulated Public Companies through, inter alia: (a) false and misleading press releases; (b) false and misleading SEC filings; (c) fraudulent concealment of the defendants' and their co-conspirators' beneficial ownership; (d) engineering price movements and trading volume in the stocks; and (e) unauthorized purchases of stock in accounts of unwitting investors.

A.     The CodeSmart Manipulation Scheme

    (i)     Control of the Purportedly Unrestricted Stock

19.     In April 2012, First Independence filed a Form S-1 with the SEC to register an offering of 3,000,000 shares of its stock, which was made effective on August 7, 2012. In or about January 2013, despite projecting an extremely pessimistic outlook in prior SEC filings, First Independence sold its entire lot of 3,000,000 shares to twenty-four shareholders, based primarily in Florida, for $0.0115 per share, raising $34,500 for the company. The 3,000,000 shares were registered with First Independence's transfer agent on February 7, 2013. The Form S-1 did not authorize any subsequent distribution of those shares to others or to the general public.

20.     From February 2013 through April 2013, there was no public trading of First Independence's stock. On or about May 3, 2013, CodeSmart, a private company, was acquired by First Independence, a shell public company, in a reverse merger. Following the reverse merger, the new company operated under the CodeSmart name.

21.     In or about May 2013, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," and MICHAEL MORRIS, together with others, purchased the 3,000,000 purportedly unrestricted shares at $0.023 per share from the aforementioned twenty-four shareholders. The defendant DARREN OFSINK, who received 125,000 shares, received the new stock certificates and enabled DISCALA, JOSEPHBERG, MORRIS and their co-conspirators to conceal their beneficial ownership interest in the 3,000,000 shares by distributing the shares across a number of co-conspirators and by placing them in nominee accounts designed to conceal the true beneficial owners of the shares. On June 14, 2013, CodeSmart implemented a 2-for-1 forward stock split

7

of its common stock which caused the 3,000,000 shares controlled by DISCALA and his co-conspirators to double to 6,000,000 shares.

    (ii)  The Pump and Dump Schemes

    22.  After gaining control of CodeSmart's purportedly unrestricted shares, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," DARREN OFSINK and MICHAEL MORRIS, together with others (collectively, the "CodeSmart Co-Conspirators"), engaged in two separate pumps and dumps. The first pump and dump occurred between approximately May 13, 2013 and August 21, 2013. During this first period, the CodeSmart Co-Conspirators manipulated CodeSmart's stock price by raising it from $1.77 to a high of $6.94, before causing it to drop to $2.19. The second pump and dump occurred between approximately August 21, 2013 and September 20, 2013. During this second period, the CodeSmart Co-Conspirators manipulated CodeSmart's stock price by raising it from $2.19 to a high of $4.60, before causing it drop to $2.13.

    23.  CodeSmart's market capitalization at its highest closing price of $6.94 per share on July 12, 2013 was $86,347,800. However, that same day, CodeSmart filed with the SEC an amended Form 10-K, signed by the defendant IRA SHAPIRO, in which CodeSmart listed only $6,000 in total assets, $7,600 in revenue and a net loss of $103,141. By December 30, 2013, CodeSmart's stock was trading at $0.66 per share, and on July 9, 2014, CodeSmart's stock closed at $0.01 per share.

    24.  In furtherance of the CodeSmart stock manipulation scheme, the CodeSmart Co-Conspirators coordinated their trading activity with the issuance of company press releases, a number of which contained false and misleading information. These press

releases, which touted agreements between CodeSmart and various universities and learning institutions, were issued at an accelerated rate in an effort to generate market interest in the stock. For example, on or about May 28, 2013, CodeSmart issued a press release which stated, in part, that "its CodeSmart University product is the exclusive strategic partner for ICD-10 education and consulting services to Binghamton University, part of the State University of New York ('SUNY') system, which will exclusively market and provide CodeSmart University products to their students in the School for Continuing Education." Contrary to this representation, CodeSmart was not the "exclusive strategic partner" for ICD-10 education courses at Binghamton University because Binghamton University also offered courses through other providers and had no plans to exclusively market CodeSmart University to its students. Upon issuance of this press release, the trading volume of CodeSmart's shares surged to 316,000 compared to 122,400 the trading day before the press release.

25.     During the first pump and dump period, the CodeSmart Co-Conspirators filed and caused to be filed with the SEC forms that contained material misrepresentations and omissions. For example, on July 12, 2013, the day CodeSmart's stock closed at its highest share price of $6.94, CodeSmart filed with the SEC an amended Form 8-K, signed by the defendant IRA SHAPIRO, in which CodeSmart estimated "about $10 million in revenues over the following 12 months from the date of this Report." On August 19, 2013, approximately one month later and the day CodeSmart's stock price had dropped dramatically to $2.50 per share, CodeSmart filed with the SEC a Form 10-Q, signed by SHAPIRO, which stated that the company did "not have sufficient funds to fully implement [its] business plan," and that, if they did not obtain the funds, CodeSmart "may need to curtail or cease [its] operations until such time as [it has] sufficient funds."

26.     During the second pump and dump period, the CodeSmart Co-Conspirators filed and caused to be filed with the SEC forms that contained material misrepresentations and omissions.  For example, on August 26, 2013, at a time when CodeSmart's stock was rising and closed at $3.10 per share, CodeSmart filed with the SEC a Form 8-K, signed by the defendant IRA SHAPIRO, in which SHAPIRO stated, "If we continue on the track we are on, I believe we will achieve our revenue and profit goals that were previously disclosed for 2013 and beyond."  The next day, on August 27, 2013, CodeSmart filed with the SEC a Form 8-K, signed by SHAPIRO, in which CodeSmart announced that CodeSmart's Chief Executive Officer, SHAPIRO, had purchased 25,000 shares of the company's stock from the public market at the market value of $3.21 per share for a cost of $80,250.  In this SEC filing, SHAPIRO extolled his purchase of CodeSmart stock and stated that his "stock purchase [was] symbolic of [his] confidence in the Company and its mission."  In reality, SHAPIRO did not pay for the 25,000 CodeSmart shares purchased in his brokerage account.  On September 4, 2013, the same day that SHAPIRO paid $81,278 from his personal bank account to his brokerage firm for the 25,000 shares of CodeSmart, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," directed the transfer of $81,278 from Fidelis' bank account, which DISCALA controlled, to SHAPIRO's personal bank account.

27.     Additionally, during the second pump and dump period, the CodeSmart Co-Conspirators fraudulently engineered price movements and trading volume in the stocks through, inter alia, wash trades and matched trades.  For example, on August 21, 2013, in order to reap profits from CodeSmart stock during the second pump, the CodeSmart Co-Conspirators sold approximately 140,000 shares from a trading account at Halcyon that was controlled by defendant ABRAXAS J. DISCALA, also known as "AJ Discala," but held in the name of Jane

Doe, DISCALA's administrative assistant whose identity is known to the Grand Jury. Because there was no genuine market demand to purchase 140,000 CodeSmart shares at this time, DISCALA directed the defendants CRAIG JOSEPHBERG, also known as "Jobo," MICHAEL MORRIS and other co-conspirators to purchase the CodeSmart shares. Approximately half of the 140,000 CodeSmart shares sold that day were purchased by JOSEPHBERG, using the Garper account, by MORRIS, using his Halcyon account, and by other co-conspirators and individuals affiliated with the co-conspirators.

(iii)   Profits at Investors' Expense

28.    The CodeSmart Co-Conspirators profited by selling CodeSmart stock, issued to them at pennies, to Halcyon customers of the defendant CRAIG JOSEPHBERG, also known as "Jobo," and clients of Co-Conspirator 1, an investment adviser representative and registered broker whose identity is known to the Grand Jury. On some occasions, the CodeSmart Co-Conspirators sold CodeSmart shares to JOSEPHBERG's customers at Halcyon and Co-Conspirator 1's clients without the customers' and clients' knowledge and consent and without providing them with required disclosures.

29.    At the same time that the defendant CRAIG JOSEPHBERG, also known as "Jobo," together with others, was purchasing CodeSmart stock in Halcyon's customers' accounts, JOSEPHBERG was selling CodeSmart stock in Garper's brokerage accounts and the defendant MICHAEL MORRIS was selling CodeSmart stock in his son's brokerage accounts and sharing in the profit from those sales. Specifically, in or about and between May 2013 and October 2013, Halcyon's customers purchased approximately 130,000 shares of CodeSmart. During this same period, JOSEPHBERG sold approximately 86,000 shares of CodeSmart stock

11

in Garper's brokerage accounts and MORRIS sold approximately 62,500 shares of CodeSmart stock in his son's brokerage accounts.

30. On or about and between May 13, 2013 and August 7, 2013 alone, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," MICHAEL MORRIS, and their co-conspirators sold approximately 859,226 shares of CodeSmart in their personal and family accounts while JOSEPHBERG and Co-Conspirator 1 purchased 813,577 shares of CodeSmart in their customers' and clients' accounts.

31. When Co-Conspirator 1's clients complained about losses they suffered as the price of CodeSmart shares dropped, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO and DARREN OFSINK, together with others, devised a plan to provide the complainants with additional shares of CodeSmart stock at a price below the publicly traded market price. To accomplish and justify this fraudulent transfer of 750,000 shares to Co-Conspirator 1's clients, DISCALA, SHAPIRO, OFSINK and others caused CodeSmart to enter into a sham consulting agreement with a shell company controlled by Co-Conspirator 1 and transferred 750,000 shares of CodeSmart to the shell company under the guise of consulting fees.

32. The defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," DARREN OFSINK and MICHAEL MORRIS profited through their fraudulent manipulation of CodeSmart's stock. The defendants profited as follows: (a) DISCALA profited at least $3 million from trading CodeSmart's stock, which included $600,000 in profit from an account held in the name of Jane Doe; (b) JOSEPHBERG profited at least $750,000; (c) SHAPIRO was paid an annual salary of approximately $225,000; (d) OFSINK profited at least $300,000; and (e) MORRIS profited at least $160,000, including $135,000 in profit from an account held in his son's name.

B.      The Cubed Manipulation Scheme

(i)      The Formation of Cubed

33.      On March 6, 2014, Northwest, a shell public company with only nominal

assets and no revenues, appointed John Doe 1, an individual whose identity is known to the

Grand Jury, the President and Chief Operating Officer of Crackpot, Inc. ("Crackpot"), a private

company, as its sole officer and director.  Crackpot marketed itself as a "developer of a mobile-

first information communications technology that offers users a digital platform for the creation

of content that combines text, images, audio, and video."  A week later, on March 14, 2014,

Northwest filed with the SEC a Form 8-K explaining that Northwest had changed its name to

Cubed.

34.      On March 24, 2014, Cubed filed with the SEC a Form 8-K stating that it

had entered into an intellectual property purchase agreement (the "Asset Purchase Agreement")

with Crackpot pursuant to which it acquired intellectual property, specifically a "mobile-first

platform," from Crackpot.  In exchange for this intellectual property, Cubed agreed to pay

Crackpot $350,000 and 2,537,455 restricted shares of Cubed.  Cubed had no assets and was a

penny stock at the time of the Asset Purchase Agreement.  Through this Asset Purchase

Agreement, Crackpot, a private company, effectively became Cubed, a public company.  On

March 26, 2014, Cubed's board of directors appointed John Doe 2, an individual whose identity

is known to the Grand Jury, the original founder of Crackpot, as the new Chief Executive Officer

and President, replacing John Doe 1.

(ii)      The Fraudulent Stock Manipulation

35.      On March 28, 2014, 200 shares of Cubed were sold at $5.00 per share.

Based on the $5.00 share price and its outstanding common stock, Cubed had a market

capitalization of approximately $150 million. On April 22, 2014, after 15 days of no trading activity, Cubed's stock began trading in earnest at a price of $5.25; the stock closed that day at $5.20.

36.     On or about and between April 22, 2014 and April 30, 2014, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and DARREN GOODRICH, together with others (collectively, the "Cubed Co-Conspirators"), were responsible for manipulating the vast majority of the trading activity in Cubed through, inter alia, wash trades and matched trades. Specifically, the Cubed Co-Conspirators purchased more than 50% of the total number of Cubed shares purchased during this period. The Cubed Co-Conspirators used BD Firm 1, where JOSEPHBERG was employed, and BD Firm 2, where GOODRICH was employed, among other firms, to execute these fraudulent trades.

37.     On or about and between May 2, 2014 and June 29, 2014, law enforcement authorities conducted a judicially-authorized wiretap of the defendant ABRAXAS J. DISCALA's, also known as "AJ Discala," cellular telephone (the "Discala Wiretap"). The Discala Wiretap revealed that the Cubed Co-Conspirators used wash trades and matched trades to manipulate Cubed's stock price and volume. Rather than generating significant market interest and causing a quick pump and dump that would elicit regulators' scrutiny, the Cubed Co-Conspirators engaged in a scheme that gradually increased the price of Cubed's stock to give it the appearance of a legitimate company with genuine and steady market demand for the security.

38.     For example, in or about and between April 22, 2014 and May 22, 2014, the Cubed Co-Conspirators successfully manipulated Cubed's stock, causing its share price to gradually increase from a closing price of $5.20 on April 22, 2014 to a closing price of $5.42 on

May 22, 2014. During this period, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," controlled the fraudulent manipulation of Cubed's stock by directing the price and volume of Cubed's shares traded on the market. For example, on May 5, 2014, DISCALA called the defendant DARREN GOODRICH and stated, "Can you buy a 100 and see if [the other market maker] moves?" GOODRICH complied and then responded, "Yeah, they're going." In another example, on May 6, 2014, DISCALA sent a text message to the defendant CRAIG JOSEPHBERG, also known as "Jobo," stating, "Go 531. Please." That day, Cubed's stock closed at $5.32 per share.

(iii)    The Escrow Account

39.     To successfully execute their fraudulent scheme of causing a controlled rise of Cubed's stock, the Cubed Co-Conspirators used one or more escrow accounts that were maintained by the defendant KYLEEN CANE to manipulate the price and volume of Cubed's stock. For example, on May 9, 2014, during a telephone call between the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," and DARREN GOODRICH, GOODRICH stated, "Run me through the escrow thing that [CANE] is doing again," and DISCALA responded, "Yeah, don't, she doesn't even like to talk about it . . . there is no stock in the 267 [267,000 purportedly free trading shares], and once you get face to face with her, she'll explain it to you[.]" In a follow-up conversation between GOODRICH and DISCALA on May 20, 2014, DISCALA asked, "What did Kyleen [CANE] tell you about the Cube?" and GOODRICH responded, "She explained the escrows, everything." On that same day, during a telephone call between DISCALA and Co-Conspirator 2, a corrupt investor whose identity is known to the Grand Jury, after discussing a conversation between the defendant CRAIG JOSEPHBERG, also known as "Jobo," and CANE about the escrow account, DISCALA

15

explained his control over Cubed's share price, and stated, in part, "I'm the [expletive] brake and the gas, [expletive]. If I take my foot off the brake it's 55 [dollars] tomorrow (Laughter)."

40.     On May 23, 2014, due to poor coordination with a co-conspirator, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," briefly lost control of his manipulation of Cubed's share price, which caused it to surge from the previous day's closing price of $5.42 to an intraday high of $7.05 per share. However, DISCALA regained control that same day and brought the share price back down to have it close at $6.30 per share.

41.     During four telephone calls that day, May 23, 2014, the defendant ABRAXAS J. DISCALA's, also known as "AJ Discala," control of the price of Cubed's stock is apparent. During a telephone call that morning, DISCALA and the defendant KYLEEN CANE discussed the jump in Cubed's price to $7 per share, and CANE stated, in part, "We need to keep it back down now. We need to keep it back down." Later that day, during a telephone call between DISCALA and Co-Conspirator 2, DISCALA stated, in part, "I talked to Kyleen [CANE], and we, we don't want this. We would want 6.35 today, 6.30, something like that, and then let, let news rip it next week." DISCALA also called Co-Conspirator 3, a corrupt investor whose identity is known to the Grand Jury, to explain the trading in Cubed's share price, and stated, in part, "Yeah like…it just looks stupid! It went up, and up, and then it came back, you know – it's like, look, if we ended at 6.30, we're good. I wanna bring it back up to 6.55; 6.55 on Tuesday, which I can, with some news, right? And just keep stepping it." Finally, during a telephone call with the defendant DARREN GOODRICH, DISCALA stated, "So Kyleen's [CANE] re-tweaking this thing to 6.35, I just wanted to let you know."

42.     Over the next month, the Cubed Co-Conspirators continued to fraudulently manipulate Cubed's stock using the escrow account. On June 23, 2014, Cubed

16

reached its highest closing price of $6.75 per share. At $6.75 per share, Cubed's market capitalization was approximately $200 million. On April 21, 2014, however, Cubed filed with the SEC a Form 10-Q and reported less than $1,500 in cash, zero revenue, negative stockholders' equity, a net loss of $15,000 and accrued professional fees of $131,824. On July 9, 2014, Cubed's stock price closed at $6.60 per share and was, thus, still in the controlled pump phase of the fraudulent manipulation scheme orchestrated by the Cubed Co-Conspirators when trading was halted by the SEC.

C.     The StarStream and Staffing Group Manipulation Schemes

43.     In or about and between October 2013 and July 2014, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," and KYLEEN CANE, together with others, agreed to fraudulently manipulate StarStream's and Staffing Group's stocks by artificially controlling the price and volume of StarStream's and Staffing Group's stocks through, inter alia, wash trades and match trades.

(i)     The StarStream Manipulation

44.     In furtherance of the scheme to manipulate StarStream's stock, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," and KYLEEN CANE, together with others, coordinated the fraudulent buying and selling of StarStream's stock through the use of, inter alia, text messages and telephone calls.

45.     On May 7, 2014, Co-Conspirator 3 sent a text message to the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," stating, "We may need to buy SSET at close. I think EJA has some $. Got get it to 15 cents. LOL what a joke." That day, StarStream's stock price closed at $0.30 on 41,100 trading volume, a significant decrease from the previous day's closing price of $0.48 on 16,200 trading volume. The following day, on May 8, 2014,

StarStream's stock price closed at $0.15 per share, exactly the price proposed by Co-Conspirator 3.

46.     On May 13, 2014, before trading commenced, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," sent a text message to Co-Conspirator 1, stating, "We got good stuff going. Sset. Should be over a buck today." That day, StarStream's stock price, which opened at $0.35 per share, reached an intraday high of $1.05 per share, before closing at $0.80 per share.

(ii)     The Staffing Group Manipulation

47.     In furtherance of the scheme to manipulate Staffing Group's stock, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," and KYLEEN CANE, together with others, coordinated the fraudulent buying and selling of Staffing Group's stock through the use of, inter alia, text messages and telephone calls.

48.     On May 7, 2014, Co-Conspirator 1 sent a text message to the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," stating, "TSGL is tanking. We still good?" In response, DISCALA stated, "Yes. Buy all u can at 20 or better. We're cleaning it up." On May 7, 2014, Staffing Group's stock price closed at $0.25 on 178,300 trading volume, a significant decrease from the previous day's closing price of $0.36 on no trading volume.

49.     On May 16, 2014, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," sent a text message to the defendant CRAIG JOSEPHBERG, also known as "Jobo," stating, "Call in victors tsgl. Supposed to be good til cancel. This shot affects us." On May 16, 2014, the trading volume in the Staffing Group was 13,500 compared to 1,700 on the previous trading day and 2,500 on the following trading day.

18

50.     On May 30, 2014, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," sent a text message to Co-Conspirator 3, stating, "Buy 5k more ts [TSGL] market im gonna get this thing flying."  On May 30, 2014, Staffing Group's stock price closed at $0.42 per share on 187,300 trading volume, which was almost double the closing price of $0.23 on 6,000 trading volume on the previous day.

COUNT ONE

(Conspiracy to Commit Securities Fraud –
the Manipulated Public Companies)

51.     The allegations contained in paragraphs one through fifty are realleged and incorporated as though fully set forth in this paragraph.

52.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in the Manipulated Public Companies, in connection with the purchase and sale of investments in the Manipulated Public Companies, directly and indirectly, by use of means and instrumentalities of

19

interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

53.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS, together with others, committed and caused to be committed, among others, the following:

OVERT ACTS

a.     On or about June 4, 2013, SHAPIRO sent an email to John Doe 3, a representative of Ramapo College of New Jersey whose identity is known to the Grand Jury, copying two of SHAPIRO's colleagues, whose identities are known to the Grand Jury, and stated, in part, "My apologies on behalf of CODESMART.  We did not know about that language you [sic] were allowed to use and certainly will consult with you next time we do a promotion.  This is all done in a spirit of promoting business opportunities for you as a partner."

b.     On or about August 15, 2013, DISCALA signed a purchase agreement on behalf of Fidelis whereby he sold 25,000 shares of CodeSmart common stock to Victim 1, an individual whose identity is known to the Grand Jury, for $3,500 at a purchase price of $0.14 per share.

c.     On or about August 27, 2013, SHAPIRO filed with the SEC a Form 8-K on behalf of CodeSmart and stated that he had purchased 25,000 shares of the company's stock from the public market at the market value of $3.21 per share for a cost of $80,250.

       d.      On or about October 17, 2013, OFSINK caused an email to be sent to SHAPIRO, which email attached a sham consulting agreement, a CodeSmart board consent form approving the consulting agreement in exchange for 750,000 shares, and an instruction letter to transfer 750,000 shares of CodeSmart to a shell company.

       e.      On or about May 6, 2014, during a telephone call between DISCALA and GOODRICH discussing the trading of Cubed shares, DISCALA inquired, in part, "Can you get [your trader] off that 451? He's killing the box," adding, "It's 526, he's in the middle of the 5's at 451[.]" and GOODRICH responded, in part, "Where do you want him? I'll call him right now."

       f.      On or about May 12, 2014, during a telephone call between DISCALA and Co-Conspirator 2, Co-Conspirator 2 stated, in part, "We should start sending [JOSEPHBERG] morons, by the way. We could trade for free, you know, send him a moron, you know, a guy you don't know and then we'll just buy stocks and if they don't go up by the end, we'll buy, like, options – Twitter options – that expire in, like, a day. Either we'll make like twenty times or we'll just give him the stock."

       g.      On or about May 17, 2014, during a telephone call between DISCALA and Co-Conspirator 3, DISCALA stated, in part, "So our deal is going to pay the Cube two-fifty, cause these guys can't generate revenue, so I'm going to generate it myself."

       h.      On or about May 20, 2014, during a telephone call between DISCALA and GOODRICH about the escrow account and Cubed trading, GOODRICH stated, in part, "[Y]ou did a perfect job. Hearing it out of [CANE's] mouth, that makes sense."

       i.      On or about May 20, 2014, during a telephone call between DISCALA and Co-Conspirator 2, DISCALA stated, in part, "Right, because I'm the [expletive]

brake and the gas, [expletive]. If I take my foot off the brake it's 55 [dollars] tomorrow (Laughter)."

           j.      On or about May 21, 2014, during a telephone call between DISCALA and CANE, CANE stated, in part, "You know [the Investor Relations/Public Relations guys are] going to be doing it and I also just talked to two people that are gonna probably going to put in another half a million into Cubed for some interim, interim money."

           k.      On or about May 22, 2014, during a telephone call between DISCALA and JOSEPHBERG, JOSEPHBERG stated, in part, "I don't want to be the only one buying today. I heard it looks very bad for a broker to be the only one buying, that's what I heard."

           l.      On or about May 27, 2014, during a telephone call between DISCALA and CANE, CANE stated, in part, "Well it's um, it's gonna start happening . . . I don't know if the press has even come out yet. There's gonna be a release today . . . on the . . . acquisition . . . we're having a conference call in about 30 minutes with the first PR that's gonna go out – the PR group."

           m.      On or about May 29, 2014, during a telephone call between DISCALA and GOODRICH, DISCALA stated, in part, "No, just buy 100 and stay under 43. I'll have the other guys move up."

           n.      On or about June 6, 2014, during a telephone call between DISCALA and Co-Conspirator 3, Co-Conspirator 3 stated, in part, "We don't need to go up every [expletive] day, but the bottom line is, you know, we're [expletive] supporting the stock[.]"

          (Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Conspiracy to Commit Mail Fraud and Wire Fraud –
the Manipulated Public Companies)

52.     The allegations contained in paragraphs one through fifty are realleged and incorporated as though fully set forth in this paragraph.

53.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS, together with others, did knowingly and intentionally conspire:

a.     to devise a scheme and artifice to defraud investors and potential investors in the Manipulated Public Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to cause to be delivered matter and things by FedEx Corp. ("FedEx") and other private and commercial interstate carriers according to the direction thereon, contrary to Title 18, United States Code, Section 1341; and

b.     to devise a scheme and artifice to defraud investors and potential investors in the Manipulated Public Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

23

<u>COUNT THREE</u>
(Securities Fraud – CodeSmart)

54.     The allegations contained in paragraphs one through thirty-two are realleged and incorporated as though fully set forth in this paragraph.

55.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," DARREN OFSINK and MICHAEL MORRIS, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in CodeSmart, in connection with the purchases and sales of investments in CodeSmart, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 <u>et</u> <u>seq</u>.)

24

COUNT FOUR
(Securities Fraud – Cubed)

56.     The allegations contained in paragraphs one through eighteen and thirty-three through forty-two are realleged and incorporated as though fully set forth in this paragraph.

57.     In or about and between March 2014 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and DARREN GOODRICH, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in Cubed, in connection with the purchases and sales of investments in Cubed, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNTS FIVE THROUGH ELEVEN
(Wire Fraud)

58.     The allegations contained in paragraphs one through fifty are realleged and incorporated as though fully set forth in this paragraph.

25

59.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," and DARREN GOODRICH, together with others, did knowingly and intentionally devise a scheme and artifice to defraud investors and potential investors in the Manipulated Public Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises.

60.     On or about the dates set forth below, for the purpose of executing such scheme and artifice, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," and DARREN GOODRICH, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, as set forth below:

| Count | Defendant(s) | Date | Description |
| --- | --- | --- | --- |
| FIVE | DISCALA | 05/09/2014 | Telephone call from DISCALA to Co-Conspirator 3 discussing, inter alia, the manipulation of Cubed's stock. |
| SIX | DISCALA and GOODRICH | 05/09/2014 | Telephone call from DISCALA to GOODRICH discussing, inter alia, the manipulation of Cubed's stock. |
| SEVEN | DISCALA | 05/09/2014 | Telephone call from DISCALA to Broker 1, an individual whose identity is known to the Grand Jury, discussing, inter alia, the manipulation of Cubed's stock. |
| EIGHT | DISCALA | 05/09/2014 | Telephone call from DISCALA to Co-Conspirator 2 discussing, inter alia, the manipulation of Cubed's and StarStream's stocks. |

| Count | Defendant(s) | Date | Description |
|-------|--------------|------|-------------|
| NINE | DISCALA | 06/12/2014 | Telephone call from DISCALA to Trader 1, an individual whose identity is known to the Grand Jury, discussing, inter alia, the manipulation of StarStream's stock. |
| TEN | DISCALA and JOSEPHBERG | 06/12/2014 | Telephone call from DISCALA to JOSEPHBERG discussing, inter alia, the manipulation of StarStream's stock. |
| ELEVEN | DISCALA | 06/12/2014 | Telephone call from DISCALA to Co-Conspirator 3 discussing, inter alia, the manipulation of CodeSmart's, Cubed's and StarStream's stock. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

<u>CRIMINAL FORFEITURE ALLEGATION</u>

61.     The United States hereby gives notice to the defendants ABRAXAS J.

DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as

"Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL

MORRIS that, upon conviction of any of the above-charged offenses, the government will seek

forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28,

United States Code, Section 2461(c), of any property, real or personal, which constitutes or is

derived from proceeds traceable to any of the above-charged offenses, including but not limited

to the following:

        a.      a sum of money in United States currency, in an amount to be

determined at trial, for which the defendants will be jointly and severally liable;

        b.      real property and premises known as 10 Vincent Place, Norwalk,

Connecticut, and all proceeds traceable thereto;

        c.     approximately $73,500.00 formerly on deposit in Bank of America Account No. 385015350211 held in the name of OmniView, and seized pursuant to a court-authorized seizure warrant on or about July 15, 2014, and all proceeds traceable thereto;

        d.     approximately $49,486.99 formerly on deposit in Bank of America Account No. 385019351669 held in the name of DISCALA, and seized pursuant to a court-authorized seizure warrant on July 15, 2014, and all proceeds traceable thereto;

        e.     approximately $35,946.65 formerly on deposit in Bank of America Account No. 385019351834 held in the name of a nominee of DISCALA, and seized pursuant to a court-authorized seizure warrant on July 15, 2014, and all proceeds traceable thereto;

        f.     approximately $27,186.35 formerly on deposit in Bank of America Account No. 38019351847 held in the name of a nominee of DISCALA, and seized pursuant to a court-authorized seizure warrant on July 15, 2014, and all proceeds traceable therto.

        62.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

_____
FOREPERSON

_____
ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. #2013R01203
FORM DBD-34
JUN. 85

No. 14 CR 399 (S-1) (ENV)

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

### THE UNITED STATES OF AMERICA

*vs.*

*ABRAXAS J. DISCALA, et al.,*

Defendants.

# SUPERSEDING INDICTMENT

(T. 15, U.S.C., §§ 78j(b) and 78ff;  T. 18, U.S.C., §§ 371, 981(a)(1)(C),
1343, 1349, 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day.*

*of* _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

*Shannon C. Jones, Assistant U.S. Attorney (718) 254-6379*